IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ANTHONY B.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ANTHONY B., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ANDREW B., APPELLANT.

Filed December 10, 2024.    No. A-24-148.

Appeal from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Reversed and remanded for further proceedings.

Derek L. Mitchell for appellant.

No appearance for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Andrew B. appeals from the order of the Dawson County Court, sitting in its capacity as a juvenile court, terminating his parental rights. He contends that the court erred in finding that statutory grounds existed for termination and that termination of his parental rights was in the child's best interests. For the reasons stated herein, we reverse and remand for further proceedings.

- 1 -

## II. STATEMENT OF FACTS

### 1. BACKGROUND

Andrew and Desaray S. are the biological parents of Anthony B., who was born in July 2022. Desaray relinquished her parental rights and therefore is only referenced as needed for context.

On August 31, 2022, the Department of Health and Human Services (DHHS) received a report via the child abuse hotline alleging concerns that Anthony was being physically neglected by his parents with specific concerns reported including that 6-week-old Anthony was underweight; that the parents were feeding Anthony rice cereal which posed a choking hazard; that the parents frequently yelled at Anthony; and that Andrew had hit Desaray causing bruising. After responding to the report, DHHS found Andrew was conditionally safe pending review of his medical records. However, the following day, DHHS received another report via the child abuse hotline indicating that Anthony had been admitted to the hospital for poor weight gain and had been diagnosed with failure to thrive.

### 2. PETITION FOR ADJUDICATION AND MOTION FOR EMERGENCY CUSTODY

On September 2, 2022, the State filed a petition alleging that Anthony was a child within the meaning of Neb. Rev. Stat. 43-247(3)(a) (Cum. Supp. 2022), in that he lacked proper parental care by reason of the fault or habits of his parents; that his parents neglected or refused to provide proper or necessary subsistence, education, or other care necessary for Anthony's health, morals, or well-being; and/or Anthony was in a situation dangerous to life or limb or injurious to his health or morals.

That same day, the State filed a motion and affidavit for emergency placement of Anthony based upon the child abuse hotline reports and medical information indicating that Anthony, who was 6 weeks old, was in medical danger due to malnutrition. The motion and affidavit for emergency placement provided that on September 1, 2022, at her postnatal medical appointment, after Desaray informed the physician about the DHHS allegations, the physician noted concerns about Anthony's appearance and requested to weigh Anthony. After weighing Anthony, it was determined that he had only gained 80 grams since birth and was in the zero percentile for weight. Anthony was subsequently admitted to the hospital and diagnosed with failure to thrive. According to the affidavit, the physician reported that, "[i]mmediately upon admission [Anthony] took 4 oz very quickly/well with minimal spit up." The physician reported that there was no apparent reason for the diagnosis other than malnutrition and that Anthony had not been fed sufficient formula. After being admitted to the hospital, Anthony did not experience problems eating and gained 3.5 ounces prompting his physician to state that, with adequate nutrition, Anthony would gain weight. The affidavit further provided that the same physician expressed concerns that the parents frequently yell at Anthony. It was also reported that in June 2022 there was an incident of domestic violence at which time Andrew struck Desaray causing bruising. The district court granted the State's ex parte motion for emergency placement and granted DHHS temporary custody and placement of Anthony.

### 3. ADJUDICATION AND DISPOSITION

On September 9, 2022, Andrew pled no contest to the State's petition, and the court adjudicated Anthony as a child within the meaning of § 43-247(3)(a). The court ordered DHHS to provide reasonable visitation to Andrew. At the October 6 disposition hearing, the court found that "the provisions of the DHHS case plan of 10/06/2022 are reasonably material to the rehabilitation objective of eliminating the situation or condition for which the adjudication has been obtained and is adopted by the Court. All parties are directed to comply with its terms including any Court ordered amendments."

### 4. CASE PLAN AND PERMANENCY REVIEW HEARINGS

Throughout the pendency of the case, the case plan goals developed for Andrew and adopted by the court, identified four priority goals. Andrew's first goal was to "understand and maintain his own mental health and understand how his mental health affects his ability to appropriately/safely parent Anthony as evidenced by completing a psychological evaluation and following all of the recommendations." The strategies for this goal included:

1. Andrew will complete a mental health evaluation and follow all recommendations of the evaluation[;]

2. Andrew will regularly attend all medication management appointments and ensure that he is taking [his] medications properly[;]

3. Andrew will work with his therapists to address healthy vs. unhealthy relationships and improve his communication with Desaray and others[;]

4. Andrew will work with his therapist to understand how his mental health needs impact his ability to safely parent Anthony[;]

5. Andrew will develop and utilize a positive support system that will support proper care of Anthony[,] and;

6. Andrew will work on appropriate communication and how to ask for help with Anthony's needs[.]

Andrew's second goal was that he "will be able to meet the basic needs of Anthony as evidenced by maintaining legal employment, obtaining and maintaining stable and appropriate housing, developing a plan for transportation of Anthony to appointments and developing and following a budget." The strategies for this goal included:

1. Andrew will maintain legal employment[;]

2. Andrew will obtain stable and appropriate housing and maintain housing by paying all bills on time and eliminating any safety concern for Anthony[;]

3. Andrew will develop a plan for transportation of Anthony to and from all appointments[;]

4. Andrew will develop and implement a budget to ensure he can meet the needs of Anthony consistently, and[;]

5. Andrew will maintain a clean and sanitary household - and eliminate any concerns as Anthony becomes more mobile[.]

Andrew's third goal was that he "will meet all of Anthony's medical needs as evidenced by attending all medical appointments and following all recommendations of Anthony's medical team." The strategies for this goal included:

1. Andrew will attend all medical appointments for Anthony[;]

2. Andrew will work with Anthony's doctors to help them understand the significance of being diagnosed with failure to thrive[;]

3. Andrew will follow the recommended feeding schedule for Anthony provided by his primary care physician and any other medical professionals assigned to Anthony's team[;]

4. Andrew will document and be able to articulate Anthony's feedings to [DHHS], and;

5. Andrew will learn and understand how proper nutrition affects growth and development (physical and cognitive) in children.

Andrew's fourth goal was that he "will improve his parenting skills as evidenced by participating in parent education as scheduled, providing age appropriate supervision during visitation, identifying and responding to Anthony's cues, identifying appropriate caregivers for Anthony, and showing consistency in feedings and routine." The strategies for this goal included:

1. Andrew will attend and participate in all scheduled parent education sessions/parenting classes to develop better parenting skills[;]

2. Andrew will implement those newly learned skills into parenting time with Anthony[;]

3. Andrew will attend and participate in all scheduled visitation to utilize any newly learned skills through parent education[;]

4. Andrew will participate and be engaged in Parent Child Interactive Therapy with Anthony if deemed appropriate by Anthony's therapist[;]

5. Andrew will identify appropriate verses inappropriate caregivers, environments and situations involving Anthony[, and;]

6. Andrew will utilize appropriate caregivers to assist them with the care of Anthony[.]

Following the October 6, 2022, disposition hearing wherein the case plan was adopted, the court made similar findings during review hearings held in January, April, August, and November 2023. In addition to requiring Andrew to comply with the case plan, the court also ordered Andrew to provide DHHS with the results of an appointment with Ann Young, a psychiatrist; ordered Andrew to comply with the medication management plan authorized by Young; approved urinalysis testing for Andrew; and ordered Andrew to complete a substance abuse evaluation and comply with any recommendations.

5. MOTION FOR TERMINATION OF PARENTAL RIGHTS

On November 14, 2023, the State and the Guardian ad Litem filed a joint motion to terminate Andrew's parental rights pursuant to Neb. Rev. Stat. § 43-292(6) (Reissue 2016) (reasonable efforts failed to correct conditions leading to adjudication) and § 43-292(7)

(out-of-home placement for 15 or more months of the most recent 22 months) and alleged that termination was in Anthony's best interests.

### 6. Termination Hearing

The termination hearing was held on January 11, 2024. During the hearing, testimony was adduced from witnesses for the State including: Amanda Daily, a children and family services specialist (CFS); Stacey Hart and Amantha Moseley, family support workers; and Dr. Theodore DeLaet, a licensed psychologist. Andrew testified on his own behalf and called certain family members to testify on his behalf.

### (a) Amanda Daily's Testimony

Amanda Daily testified that she was assigned as the CFS on September 22, 2022, and initially investigated the priority one intake in response to the report made to the child abuse and neglect hotline. Although Daily's initial investigation revealed insufficient information to remove Anthony, that changed following Anthony's admission to the hospital for failure to thrive. Daily testified that the doctor informed her that "Anthony had a well-baby check that was scheduled for the following week. And if [the doctor] wouldn't have seen [Anthony] on that day, . . . it was likely that he would have died before he made it to his next appointment." Daily testified that following the second call to the hotline after Anthony was admitted to the hospital, Anthony was removed from the parents' home on September 2, 2022, and has remained in out-of-home care throughout the entirety of the case.

Daily testified that throughout the pendency of the case, there were concerns with Andrew's participation and engagement, his mental health, his substance abuse, his relationship with Desaray, his parenting skills, and his lack of acknowledgment or understanding of why Anthony was removed from his care. Daily testified that although Andrew made slight progress at times, "it was take two steps forward, take one step backwards." Daily testified that this dynamic did not change until after Andrew and Desaray ended their relationship and after discussions of changing the permanency goal to adoption.

Daily testified that Andrew completed case plan goals including: a mental health evaluation, a psychological evaluation, a substance abuse evaluation, a parenting assessment, parenting classes, participation in medication management, participation in therapy, engagement with family support services, and participation in visitation. Although Daily testified that Andrew had made some progress throughout the case, he failed to make meaningful progress in treating his mental health concerns, parenting skills, and in understanding the severity of the concerns that led to Anthony's removal and Andrew's role in that removal. Daily also testified that Andrew failed to make meaningful progress in any of his mental health treatment goals and he had to switch therapists three times. She further testified that Andrew failed to follow any of the recommendations contained in the psychological evaluation designed to address concerns related to his substance use, mental health, and parenting skills.

According to Daily, Andrew stopped taking his mental health medication in March 2023 and thereafter began having suicidal/homicidal ideations and, after an incident where Andrew became suicidal and pointed a firearm at Desaray, Andrew's visits were suspended until June 2023. In July, after Andrew attended a mental health appointment and resumed medication management,

his visits with Anthony resumed. When Andrew's visits resumed, Daily placed a new referral for visitation and family support to occur separately from Desaray's. Andrew and Desaray ended their relationship in June or July 2023.

According to Daily, after Andrew and Desaray's relationship ended and their visitation times were separated, Andrew began engaging in the case more. Daily stated "I would say the majority of the progress for Andrew has happened once he left Desaray, once he was doing visitation on his own. It was slow to begin with when visits started at the beginning of July, but he's slowly making progress in that area." Daily testified that although Andrew participated in visits, the biggest barrier to his visitation progressing from supervised visits was

> just the lack of progress being made within the parenting time, the lack of consistency, the fact that he still needs prompting. He still needs role modeling. He's only able to mimic the family support worker. He's not able to do those things on his own without prompting, that that could result in a safety issue if he were to be unsupervised.

Daily testified as to the third case plan goal related to Andrew meeting Anthony's medical needs. Daily testified that even though Andrew was notified of all of Anthony's medical appointments, Andrew only attended 4 out of the 15 scheduled appointments. Daily testified that this was especially concerning due to Andrew's denial of Anthony's failure to thrive diagnosis and Andrew's lack of appreciation of how his actions or inactions contributed to Anthony's diagnosis and removal. She further testified that despite completing the Circle of Security parenting class, Andrew still struggled to understand and implement appropriate parenting skills during visitation.

Daily testified that, "I believe that there has been some progress. I believe that he does try. There is just a lot of limitations to his ability to fully understand what needs to be done." She testified that she believed a majority of Andrew's limitations were cognitive limitations, but also

> I think a lot of it too is he wasn't at all interested at the beginning of the juvenile case. He didn't fully believe he needed to work with [DHHS]. He didn't take advantage of all of the services provided to him in the beginning. But part of it is also just a lack of follow-through.

Daily testified that she believed termination of Andrew's parental rights was in Anthony's best interests.

(b) Visitation and Family Support Worker Testimony

Stacey Hart testified that, in August or September 2022, she was assigned as the family support worker to provide 15 hours of service each week to Desaray and Andrew. However, she testified that she primarily worked with Desaray "just because Desaray worked at night, so we did day hours with her with one evening, which was on Thursdays, with Andrew." Hart testified that, of those 15 hours, Andrew would receive 2 hours on Thursday evening after he got off work between 5 p.m. and 7 p.m. Hart testified that Andrew did well preparing Anthony's bottles and preparing Anthony's bath. She stated that "[w]hen [Andrew] was engaged, he was engaged very well. When he was not focused, then . . . you can tell something was wrong." Hart testified that in some of her notes, however, she referred to Anthony as a "hot potato" because after Andrew would get off work, Desaray would expect Andrew to care for Anthony since she had him all day but "it just seemed like Andrew at times would just want to sit on the couch or sit in his chair, get

something to eat, and he didn't want anything to do with Anthony." She further testified that there were occasions when Andrew would not come straight home after work and would instead stop at his mother's house or stop at the store. Hart testified that she did not supervise any visits with Andrew after his visits were suspended in March 2023.

When Andrew's visits resumed in July 2023, Amantha Moseley was assigned to supervise Andrew's visitation with Anthony. Andrew was initially approved for 6 hours of visitation per week which was increased to 15 hours per week in November 2023. Moseley testified that during visitations, Andrew needed consistent prompting on age-appropriate parenting responses when engaging with Anthony or making sure Anthony was left in a safe area when Andrew needed to leave the room. Mosely testified that Andrew was "pretty attentive" during the visits; he appeared to be prepared for visits with diapers, outfits, and other basic necessities; he was really good about setting a routine and keeping to that schedule; and he was able to tell Moseley about a few things he learned in his parenting class and was typically able to apply them during the visits. However, Moseley stated that she would have some concerns if the visits were unsupervised due to her having to prompt Andrew on certain things like not to leave Anthony unsupervised when Andrew needed to go outside to move his vehicle.

### (c) Dr. Theodore DeLaet's Testimony

Dr. DeLaet testified that he was a licensed psychologist and that in March 2023, he completed a forensic adult psychological assessment, a substance abuse assessment, and a parenting risk assessment of Andrew. Dr. DeLaet diagnosed Andrew with major depressive disorder, borderline intellectual functioning, specific learning disorder, and moderate alcohol use disorder. He noted concerns about Andrew's suicidal ideations a week prior to completing the evaluation but said that with proper treatment and assuming Andrew was invested in that treatment, the likelihood of Andrew being able to manage his mental health concerns was "still encouraging." Dr. DeLaet also found that Andrew was rated at moderate-high risk to engage in future child maltreatment on the parenting risk assessment. Dr. DeLaet's report noted Andrew's "lack of remorse or insight" into Anthony's malnourishment and diagnosis of failure to thrive. His report also noted that Andrew had "gained no indication of personal responsibility that [Andrew] had over the situation. He believes that his son should never have been taken. These are risk elevating attitudes for risk of future child maltreatment."

Dr. DeLaet testified that although many of Andrew's issues could not be eliminated, Andrew could improve significantly based on "what he might accomplish in therapy, what he might accomplish in educational classes, like understanding healthy relationships, healthy coping skills, [and] substance use treatment." He further testified that "there are certain things that you can learn so that he could learn how to problem solve, how to cooperate, how to learn about things such as what are your child's care needs are, understanding budgeting." Dr. DeLaet further testified that Andrew's poor judgment or decision-making could be improved but "[w]e would not expect his IQ to increase, for example, but he could still improve his quality of parenting and decision-making through education and treatment and maybe being on the right medications and other sorts of things. So judgment is different from an IQ score."

Dr. DeLaet reported that Andrew had an "extremely" high score of 424 for parenting risks that "far exceed cutoff scores of 166 and 215. The score of 215 places him in the upper five percent

of the control group of persons convicted of child physical abuse." Dr. DeLaet determined that Andrew's parenting risk factors, which produced his high score, included the child's age; parental/family risks; problematic personality traits and characteristics; cognitive problems due to his diagnosis of borderline intellectual functioning and concurrent learning disorder; triggers for problems with depression, apparent post-traumatic stress disorder, and substance use problems; fragile mental health stability; triggers for impulse control disorder in the form of attention-deficit/hyperactivity disorder (AD/HD); low tolerance for stress or frustration and becomes easily overwhelmed; emotional self-regulation difficulties; the quality of his social support system and his tendency to isolate and withdraw from others; high level of personal and family-related distress; history of high conflict relationships which include domestic violence; lack of awareness of his mental health and/or substance use issues; triggers for insecure attachment with his own parents; triggers for having an inaccurate knowledge and expectations about child development, protective parenting and level of supervision needed for young children as well as having difficulty in reading and responding to his child's cues; his quality of employment and ability to provide for himself appears to be fragile; and his emotional stability is fragile to poor. Dr. DeLaet concluded:

> After considering all available data and using a structured professional judgment (SPJ) methodology, this writer determines [Andrew] is at MODERATE-HIGH RISK to engage in future child maltreatment. He has multiple active risk factors related to his relationship with [Desaray] and also his own mental health and substance use. There is a history of domestic violence in his relationship with [Desaray]. His mental health stability is fragile-to-poor, and he had made a suicide gesture the week before the present assessment involving attempting to shoot himself with a pistol. He reported a history going back several years of having suicidal thoughts and has made at least one other suicide attempt. He struggles with self-awareness and identifying his needs. This triggers a corresponding concern that he will not be able to adequately identify and address [Anthony's] concerns and need for protective parenting.

Dr. DeLaet stated that "based on findings of the present assessment, this writer recommends proceeding with high caution about reunification of [Anthony] with [Andrew]." He further recommended that Andrew participate in outpatient mental health therapy and monitoring of medication compliance; that Andrew maintain sobriety and, if he struggled with substance use, he participate in a level 1 outpatient treatment program; and that he participate in a competence-based orientation on child development, with a follow-up to assess what he has learned and if he has the ability to apply it to Anthony's situation. Dr. DeLaet did not express an opinion and deferred to the court on permanency planning and best interests.

Dr. DeLaet testified that accommodations for Andrew would be needed because Andrew's low IQ and cognitive issues "make it difficult for him to learn new things." Dr. DeLaet also expressed with "some confidence" that Andrew's low IQ and cognitive issues were factors contributing to a lack of progress in the case but "[i]t would be hard to figure out if it was the biggest factor or the second or third." However, Dr. DeLaet testified that since the evaluation, he had not received nor reviewed any new documentation that would indicate "that he had really done much to improve himself or stabilize some of these things." Dr. DeLaet ultimately deferred to

other case professionals regarding whether Andrew made meaningful progress in addressing the recommendations to decrease his overall risk factors expressing:

> As I recall from the most recent report, I think there were some indications at times that he has shown more motivation and a better attitude about it, but I think overall it was sort of like a step forward, one or two steps back kind of thing. So the net progress was minimal.

### (d) Andrew's Testimony

Regarding his case plan goals, Andrew testified that he was taking his medication "and I am doing pretty good"; that he was participating in counseling; that he completed the Circle of Security parenting class; and that he participated in supervised visitation with Anthony. Andrew testified that he recognizes Anthony's cues for when he is tired, hungry, and sometimes when he has to go to the bathroom. Although Andrew acknowledged that in March 2023, he had some severe mental health concerns that arose and resulted in the suspension of his visitation, he believed that he was not given sufficient time before the State moved to terminate his parental rights. Andrew testified that he believed he was doing better now and that he really started making improvements after his "toxic" relationship with Desaray ended. Andrew admitted to drinking alcohol in the past but stated that he has maintained his sobriety and could not remember when he had his last drink. Andrew testified that if he was given more time, he would continue making progress and feels that at some point he will be able to parent Anthony on his own.

### (e) Summary of Testimony by Other Witnesses Called on Andrew's Behalf

Andrew called his mother, his siblings, and his grandparents to testify on his behalf. Each witness generally testified that they believed that Andrew could appropriately care for Anthony on his own if Andrew set his mind to it. They testified to seeing improvements in Andrew during the pendency of the case, including in Andrew's mental health, in ending his relationship with Desaray, and in his interactions with Anthony. All of Andrew's family members generally testified that they would be willing to help Andrew care for Anthony and help ensure Andrew was meeting Anthony's needs.

Andrew's mother testified that since Anthony's removal, she had still been able to witness some of Andrew's interactions with Anthony during Andrew's supervised visitation. She testified to positive changes in Andrew's life including acquiring a full-time job, being excited to see Anthony, and abstaining from alcohol and drugs. She testified that she believed that Andrew could parent Anthony full-time "as long as he put his mind to it and put Anthony first and foremost."

Similarly, when asked whether Andrew had the ability to care for Anthony on his own, Andrew's brother testified that he believed Andrew just needed to "set his mind" to it.

Andrew's grandmother testified that since Andrew and Desaray's relationship ended, Andrew is "more calm" and "more settled with his life."

Andrew's grandfather, with whom Andrew was residing at the time of the termination hearing, testified that he has witnessed Andrew and Anthony's interactions during visits at his home and described those interactions going "[b]eautifully. They grew. Starting out it was slow, but his growth was just -- he just . . . took beautiful care of Anthony." When asked whether he

believed Andrew could care for Anthony on his own, Andrew's grandfather testified, "Yeah. I am beginning to think so. He has grown a lot since the day . . . he started taking visitation with Anthony." Andrew's grandfather acknowledged that "at first [Andrew] had to learn to take care of a baby," but stated that Andrew "has learned all these things. He's -- his attention is all on Anthony. He's -- he takes care of him."

Andrew's sister testified that she has observed that Andrew "has improved from way back when, and he's very good with Anthony." She testified to noticing improvements with Andrew's mental health, that Andrew's job has kept him focused, and that Anthony "seemed very happy with [Andrew]."

Andrew's older brother testified that he thinks Andrew is a "suitable dad" and that "I think if he was actually up to what he needs to do, he'd be a good dad." He further testified that Andrew needed to "just catch on to [cues], pay attention to Anthony, [and] not worry about what's going on around him."

### 7. COURT'S ORDER

Following the termination hearing, the court entered an order terminating Andrew's parental rights pursuant to § 43-292(6) and (7), finding that Andrew was an unfit parent, and that it was in Anthony's best interests to terminate Andrew's parental rights. Andrew has timely appealed from the court's order terminating his parental rights.

### III. ASSIGNMENTS OF ERROR

Andrew assigns as error, restated, that the court erred in (1) terminating his parental rights pursuant to § 43-292(6) and (7); and determining that he was unfit and that it was in Anthony's best interests to terminate his parental rights.

### IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

### V. ANALYSIS

#### 1. STATUTORY BASIS FOR TERMINATION OF PARENTAL RIGHTS

Andrew's first assignment of error is that the court erred in finding statutory bases for termination of his parental rights existed pursuant to § 43-292 (6) and (7). We will address these arguments separately.

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

### (a) § 43-292(7)

We first address Andrew's claim that the court erred in terminating his parental rights pursuant to § 43-292(7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *Id.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id.* And, as the Nebraska Supreme Court recently clarified in *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023), the trigger date for determining the look back period for grounds under § 43-292(7) is the date that the petition for termination of parental rights is filed.

In the present case, the evidence established that Anthony was removed from Andrew's care on September 2, 2022, and remained in out-of-home placement during the pendency of the case. The petition for termination of parental rights was filed on November 14, 2023. At the time of the petition, Anthony had been in out-of-home placement for only 14 months. As such, the court erred in determining that § 43-292(7) provided an adequate statutory basis for termination.

### (b) § 43-292(6)

The court separately found that § 43-292(6) provided a statutory basis supporting termination of Andrew's parental rights. A statutory basis to terminate a parent's rights under § 43-292(6) exists if following a determination that the juvenile is one as described in subdivision (3)(a) of § 43-247, reasonable efforts to preserve and reunify the family if required under Neb. Rev. Stat. § 43-283.01 (Cum. Supp. 2022), under the direction of the court, have failed to correct the conditions leading to the determination. Section 43-283.01 provides that "in determining whether reasonable efforts have been made to preserve and reunify the family and in making such reasonable efforts, the juvenile's health and safety are the paramount concern."

In order to terminate parental rights under § 43-292(6), the State must prove by clear and convincing evidence that (1) the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective of the plan and (2) in addition to the parent's noncompliance with the rehabilitative plan, termination of parental rights is in the best interests of the child. *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). The State is required to prove that the parents have been provided with a reasonable opportunity to rehabilitate themselves according to a court-ordered plan and have failed to do so. *Id.*

At the September 2022 adjudication hearing, Andrew admitted to the allegations contained within the State's juvenile petition and the court found that Anthony was a child within the meaning of § 43-247(3)(a). Following the October 2022 dispositional hearing, the court found "the provisions of the DHHS case plan of 10/06/2022 are reasonably material to the rehabilitation objective of eliminating the situation or condition for which the adjudication has been obtained and is adopted by the Court. All parties [were] directed to comply with its terms including any Court ordered amendments." The court made similar findings at review hearings held in January, April, August, and November 2023.

The case plan goals generally required Andrew to obtain mental health evaluations and address his mental health concerns; maintain a legal source of income and safe and stable housing;

attend Anthony's medical appointments and work directly with his doctors to understand the significance for Anthony's failure to thrive diagnosis and learn to properly care for him; and attend parenting classes and understand and apply basic parenting skills. In addition to ordering Andrew to comply with the terms of each case plan, the court ordered Andrew to provide results of an appointment with Ann Young to DHHS and to abide by any recommended medication management plan; approved UA testing "to be allowed but not required by parents"; and ordered Andrew to complete a substance abuse evaluation and comply with the recommendations.

Based upon our de novo review of the record, there are five separate matters that we ultimately find are dispositive of this case. First, we agree with the court that at the time the State moved to terminate Andrew's parental rights, Andrew had not accomplished all of the goals the court adopted from DHHS' case plan. And although Andrew had made some progress in relation to those goals and the strategies enumerated to accomplish them, Andrew most certainly was not in a position to be reunited with Anthony when the State filed its motion to terminate Andrew's parental rights nearly 14 months after Anthony's removal, primarily due to malnutrition.

Second, as it relates to the goals set by the court, when the State filed the motion to terminate Andrew's parental rights in November 2023, the evidence showed that Andrew had demonstrated significant efforts related to his court-ordered obligations including: the completion of psychological, substance abuse, and parenting risk assessments by March 2023; completion of the Circle of Security parenting class; active participation in family support work by attending the 1-2-3 Magic parenting class; work on developing a budget; participation in sessions dedicated to nutritional education provided by the family support worker; participation in supervised visitation; leaving his unhealthy relationship with Desaray in June or July 2023; participation in mental health therapy (although he switched therapists three times during the pendency of the case); completion of a second substance abuse evaluation; participation in a mental status exam as recommended by the substance abuse evaluation; and compliance with medication management since May 2023.

Third, we acknowledge Dr. DeLaet's testimony regarding Andrew's extremely high parenting risk score and the factors that contributed to that score; Andrew's cognitive limitations, poor judgment and impulse control due to his AD/HD and major depressive disorder; his historic lack of understanding of Anthony's needs which led to Anthony's removal; and his prior issues with suicidal ideations and substance abuse concerns. However, we separately note Dr. DeLaet's acknowledgement that although many of Andrew's issues could not be eliminated, Andrew could improve significantly based on "what he might accomplish in therapy, what he might accomplish in educational classes like understanding healthy relationships, healthy coping skills, [and] substance use treatment." Dr. DeLaet also opined that although "[w]e would not expect [Andrew's] IQ to increase, for example, . . . he could still improve his quality of parenting and decision-making through education and treatment and maybe being on the right medications and other sorts of things. So judgment is different than IQ score." Notably, Dr. DeLaet did not offer an opinion on whether Andrew's parental rights should be terminated in light of Andrew's conditions, and he left open the possibility that Andrew, subject to the fulfillment of certain conditions, could parent a child. Dr. DeLaet saw Andrew in March 2023, prior to the time Andrew separated from Desaray, and following that examination, Andrew appeared to make meaningful progress with his court-mandated goals. Notwithstanding that progress, the State did not provide Dr. DeLaet the opportunity to re-examine Andrew to determine what impact Andrew's participation in the

court-ordered programs and services had on Andrew since their March 2023 meeting. More specifically, Dr. DeLaet declined to offer an updated assessment "because I don't have all of the relevant information by which to do an updated or a reassessment" and noted

> that was his risk rating by the time that I offered the report about six months ago, and then I would leave it to others to decide has he made meaningful improvement in reducing risks and in improving his skills, improving his knowledge related to parenting, managing his mental health, gaining sobriety, et cetera. I have to leave that to others.

Dr. DeLaet further testified that except for the November 2023 case plan, he had not reviewed any other documents or assessments since July 2023 when he drafted his evaluation.

Fourth, regarding Andrew's progress toward his goals, Andrew's caseworkers appear to agree that Andrew actively participated in court-ordered programs and designated therapies and made progress toward his goals with that progress accelerating after March 2023. Although we acknowledge that evidence of Andrew's progress does not suggest Andrew has reached his goals and there is evidence regarding limitations to his progress, we do note that Andrew's most meaningful progress was made after Andrew and Desaray's relationship ended in June or July 2023.

Fifth, we recognize the testimony of Andrew's various family members that spoke to levels of positive change in Andrew and the support system they have built to assist Andrew in raising Anthony if reunification occurs.

As we mentioned before, in addition to proving that the parent has failed to comply, in whole or in part, with a reasonable provision material to the rehabilitative objective, the State must show that the parent has been provided with a reasonable opportunity to do so. *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). And although our appellate courts have not proscribed a specific length of time that is reasonable, we take note of § 43-292(7) which provides for a minimum of 15 months following the removal of a child from a parent before that section can operate mechanically. The relevant issue regarding § 43-292(6) is not whether the parent has problems, but, rather, whether he or she is complying with the rehabilitation plan imposed by the court and the effect of those problems upon the best interests of the child. *In re Interest of Joseph L.*, 8 Neb. App. 539, 598 N.W.2d 464 (1999).

In *In re Interest of Joseph L.*, we found that there was conflicting testimony as to the progress that the father was making when the caseworker testified that the father was making minimal progress and struggled with maintaining his sobriety, but a chemical dependency evaluation indicated that the father was receptive to an alcohol recovery program and had attended all the scheduled sessions. We further found that this conflicting evidence fell short of clear and convincing evidence under § 43-292(6) that the father had failed to comply with the court ordered rehabilitation plan.

Nebraska courts have continued to hold that in proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

Most notably here, we recognize Andrew's problems which led to Anthony's timely removal and the court's carefully constructed rehabilitation plan that was designed to address those

problems with a stated goal of reunification. We recognize Dr. DeLaet's concerns governing the severity of Andrew's problems identified in March 2023, but similarly recognize his testimony that Andrew presented with problems which could be overcome to a degree that he could successfully parent Anthony with proper assistance. And we recognize the efforts made by Andrew and his family in relation to the court-ordered plan without corresponding evidence from Dr. DeLaet on what progress Andrew has made or whether similar progress is or is not likely to result in reunification within a reasonable period of time.

When considering the evidence in this record against the fact that the State filed to terminate Andrew's parental rights only 14 months following Anthony's removal and provided no brief on appeal in opposition to Andrew's plea for additional time to continue to work with DHHS in order to continue his progress so as to accomplish the court-ordered goals and ultimately reunify with Anthony, we find that there was a lack of clear and convincing evidence that the State provided Andrew with a reasonable opportunity to comply with the court-ordered plan following Anthony's removal in September 2022 and failed to do so. This is not to say that the evidence demonstrates that Andrew has accomplished all of his goals set forth by the court or that he will accomplish those goals. In that regard, we remain concerned with Andrew's mental health issues as described by Dr. DeLaet and remain concerned with Andrew's apparent and continued lack of understanding as to why Anthony was removed. We simply hold that, on this record, where Andrew has made sizable efforts in working toward reunification and has requested additional time to accomplish the goals set forth by the court in its initial dispositional order, when considered against the rapid pace pursued by the State, the State failed to prove by clear and convincing evidence at this juncture that Andrew was provided a reasonable opportunity to rehabilitate himself in accordance with the court-ordered plan. See *In re Interest of Angelica L. & Daniel L.*, 277 Neb. 984, 767 N.W.2d 74 (2009) (burden of proof is on State, not parent, to prove by clear and convincing evidence that parent has failed to comply, in whole or in part, with reasonable provision material to rehabilitative objective of case plan). Accordingly, we find that the statutory basis for termination of parental rights under § 43-292(6) has not been met.

### 2. BEST INTERESTS

Having determined that the State failed to establish a statutory basis for termination of Andrew's parental rights, we need not consider whether Andrew was unfit or whether termination was in Anthony's best interests.

### VI. CONCLUSION

In sum, based upon our determination that the State failed to establish a statutory basis for the termination of Andrew's parental rights, we reverse the termination order entered by the court and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED FOR
FURTHER PROCEEDINGS.

- 14 -